# TEXAS COURT OF APPEALS REPORTS.

## GALVESTON TERM, 1890.

### LUKE WILLIAMS v. THE STATE.

#### No. 2873.    Decided March 13.

1.   **Practice—Jury Law.**—Motion to Quash the Special Venire was based upon the fact that after the writ was issued and delivered to an officer to be executed, the said officer made two alterations in the list of persons to be summoned by changing the name of "J. W. Turner" as written in the list to "G. S. Turner," and "T. U. Pinkerton" as written in the list to "T. U Robinson," and then serving the writ as changed upon "G. S. Turner" and "T. U. Robinson," and not "J. W. Turner" and "T. U. Pinkerton." *Held*, that the action of the officer was such an irregularity as would authorize the court to quash the venire, but its refusal to do so does not constitute material error, inasmuch as the accused did not exhaust his peremptory challenges, was not tried by an objectionable juror forced upon him, and was not otherwise, so far as made to appear, prejudiced in his rights.

2.   **Same—Amendment.**—That a sheriff, under the direction of the court, may amend the return of the *special venire* is not an open question.   The bill of exceptions shows that in this case the original return of the special venire, made by a deputy sheriff, reads: "Executed by summoning the following named jurors, to-wit;" * * * that as amended by the sheriff in person the return reads: "The persons reported and returned as summoned were served and summoned in person by my deputies."   The truth of the return as amended was contested by the defense on the ground that of the jurors summoned all of them were not summoned by deputy sheriffs, but some of them by constables; and that all of those served were not served in person, but some of them by copies of the writ left at their places of residence.   The judge's certificate to this bill of exception reads as follows:   * * *   "A full investigation of the service on the jurors was permitted during the progress of the impanelment of the jury, and all were found to have been served by officers of the court, acting under the sheriff, except three, and as to them the court excused them on peremptory challenge.   The defendant had not exhausted his challenges when the jury was impaneled."   *Held*, that no material error is made manifest in this particular.

3.   **Same.**—After the special venire and the list of jurors serving for the week were exhausted without completing the jury, the court ordered talesmen to be summoned from the body of the county to complete the panel.   The defense objected, and asked that talesmen be drawn from the persons selected by the jury commissioners to serve during the term.   Under proper practice the objection of the defense should have been sustained and the request granted, but the action of the court did not constitute material error, it not operating to force an objectionable juror upon the defendant.

4.   **Same—Case Overruled.**—The rule was announced by this court in Steagald's case, 22 Texas Court of Appeals, 464, that a conviction in a capital case would not be affirmed when the record on appeal failed to show an order of the trial court for the issuance of a special venire, presumption in such case not being entertainable.   Upon that question the Steagald decision is overruled.   The correct rule on appeal is that where the record is silent as to such order, where no objection was taken *in limine* that such order was not made, when the record shows that a jury was impaneled under a

[89]

special venire, it will be presumed that such order as the law prescribes was made and entered, or that it was waived by the defendant.    Under this rule, as now announced, the defendant's objection that the record does not show an order of the court for a special venire can not prevail, the record showing entries on the trial judge's docket authorizing the presumption in favor of the order.

5. **Murder—Evidence.**—The State's witness Bogan testified that on the evening of and after the homicide he heard the defendant say to one Williams, "Now, Jimmy, whatever you do, you must never mention my being here this evening"—referring to the premises upon which the killing occurred.    The State's witness Averett testified that on the night of the day after the homicide the defendant told him that he did not know anything about the killing of deceased, and did not hear of it until 12 o'clock on the day after it occurred.    Defendant then offered to prove by Mrs. Williams that on the evening deceased was killed defendant explained the circumstances of the killing to her, and told her that Charley Williams had killed deceased; that he himself had nothing to do with it; that he had just got to Charley Williams' house, and was in the house and had stepped to the fire-place to light his pipe when he heard cursing on the outside of the house; that he then heard a gun fire, and then went to the window and saw Charley shoot deceased, and that he then came off home, and as he came off he saw Jimmy Williams.    *Held,* that the proposed evidence was properly excluded as self-serving declarations, and as no part of the *res gestæ*.

6. **Same—Fact Case.**—See the statement of the case for evidence *held,* though circumstantial in character, sufficient to support a conviction for murder of the first degree.

APPEAL from the District Court of Milam.    Tried below before Hon. J. N. Henderson.

Convicted in the first degree for the murder of Tom Newman, the appellant was awarded a life term in the penitentiary.

For the purpose of convenient reference, the plat of the country surrounding the scene of the killing—indispensable to a fair understanding of the testimony—is inserted to precede the statement of the case.

Mrs. Ellen Padgett was the first witness for the State.    Referring to the diagram, she explained that the house marked 1 represents the house in which Mrs. Ben Williams, the sister-in-law of the defendant, lived.    The figure 2 represents the garden; figure 3 the crib on Charley Williams' place; figure 4 the Charley Williams house, or, as it was known prior to death of old Mrs. Williams, which occurred about two weeks before this homicide, the "old Mrs. Williams place;" figure 5 the smoke house on the Charley Williams place; figure 6 the residence of the witness on the opposite side of the road and about 100 yards from the Charley Williams house; figure 7 the tree at which Newman received his death wound; figures 8, 8, 8, an abandoned road running along outside of and past the Williams place; figure 9 the field back of Charley Williams' house; figure 10 the field back of Mrs. Ben Williams' place; figure 11 a tank in field 10; figure 12 a gap in the fence that divides fields 9 and 10; figures 13, 13, 13, the road between the houses of Mrs. Ben Williams and Charley Williams. The figure 14 represents a deep ravine which crosses the abandoned road 8 at a point about forty yards above house 4; the cross marks represent

trees and bushes; figure 15 the lot around crib 3; figure 16 the gate which leads from the pasture into field 9.

The defendant and Charley and Jeff and Ben Williams, the latter deceased, were brothers, and Milda and Belle Williams were their sisters, all of them being children of "old" Mrs. Williams.    When old Mrs. Williams died, about two weeks before the killing of Newman, Charley and Milda and Belle Williams took up their residence with Mrs. Ben Williams, Charley, however, retaining possession of the old Mrs. Williams place— figure 4.    On the morning of the fatal day Miss Milda Williams came to the witness's house for the purpose of remaining until after dinner.    At about 11 o'clock the witness discovered that she had no meal in the house, and Miss Milda and a little girl thereupon went to Charley Williams' house to get some for witness.    They reached the house about the time that Jeff Williams and Gus Lynch did.    Miss Milda then sent word to witness by the little girl that her brother Jeff, who did not live in the neighborhood, had arrived on a visit, and that she would not return to dine with witness.    About 2 o'clock in the afternoon the witness saw Gus Lynch leave the Charley Williams house and ride off north towards the town of Milano.

At about 4 o'clock in the afternoon the witness went to Charley Williams' house.    She found Charley and Jeff and Milda Williams at the house, and observed a shot gun lying across a bed.    Jeff Williams left a few minutes after the witness reached the house, and she did not see him again.    A short time afterwards Charley Williams also left the house. Milda Williams then cooked some biscuit, boiled some coffee, fried some meat, set the supper table, and then told witness that she had to go to the garden and set out some cabbage plants, and asked witness to go with her, to which the witness agreed.    The shot gun was still lying on the bed when witness and Milda started to the garden.    As she and Milda left the house going to the garden, the witness observed Charley Williams coming towards the house on road 13 from the direction of gate 16.    Figure 17 on the diagram represents a gate in the fence near Mrs. Ben Williams' house, which fence separates outside road 8 from the road 13 in the lane. Figures 18, 18, 18, represent a path along the pasture fence on the inside, which path was but little used.    Witness and Miss Milda Williams went straight through the woods to the garden, and not by way of road 13. They had been in the garden perhaps thirty minutes when witness heard four reports of a gun or guns fired at or near Charley Williams' house. An interval of perhaps two seconds intervened between the first and second shots; the second and third shots were fired in immediate succession, and the fourth after a short interval.    The reports all sounded like shots from a shot gun.    They were fired about half an hour before sunset on Monday evening, April 8, 1889.    The place of the shooting was in Milam County, Texas.

Cross-examined, this witness stated that the abandoned road 8 could be. but was rarely traveled in vehicles because of the bad crossing of ravine 14. It was frequently traveled by horsemen. The witness had never tried, but did not think a person could stand on the gallery of Charley Williams' house (fig. 4) and see very far up road 8 on account of intervening trees and bushes. The distance from house 4 to the road 8 was. about fifteen feet. The tree 7 stands on the outer edge of road 8, and the fence runs between the said road and house 4. The houses of Mrs. Ben Williams (fig. 1) and Charley Williams were about a half a mile apart. The garden (fig. 2) was about midway between the two said houses. It. was about seventy-five yards from house 4 to gate 16 in field 9. Open woods and brush intervene between lot 15 and the garden 2. From the said lot one can see but a short distance into the said woods. Upon the. firing of the shots the witness remarked to Miss Milda, "That is a mighty heap of shooting going on at the house." Milda replied, "Yes." Witness then left the garden to go home. En route she met her husband, who informed her that a man had been killed at Charley Williams' house. Witness then went to Mrs. Ben Williams' house. The additions to the Charley Williams house consisted of a shed room and gallery. There was a hole cut for a window in the end of the room next to road 8, but it had been nearly closed, leaving only a small opening. In the shed room, looking toward the road 8, there was a hole about a foot square.

J. W. Padgett, the husband of the preceding witness, was the next witness for the State. He testified that the defendant lived near Liberty, about eight miles north from Charley Williams' house. Jeff Williams. lived on Briar Branch, about ten miles south from Charley Williams' house. The witness saw Jeff Williams on the day preceding the killing of Newman, but had not seen the defendant since the burial of old Mrs. Williams, about two weeks before the tragedy. The witness quit work in his field at an earlier hour than usual on the evening of the killing of Newman, and went to his house to get up his horses. In going from his house to his lot he observed a man on horseback traveling the abandoned road 8, from the direction of Mrs. Ben Williams' house toward that of Charley Williams. He was going down into the ravine (fig. 14) when witness first saw him. He disappeared from view and reappeared as he emerged from the ravine on the hither side. The man was riding in an ordinary traveler's gait, and had reached a point between thirty and forty yards from the ravine when the witness heard but did not see a shot fired. Witness turned immediately and saw the man's horse rearing, and the man clinging with his left hand to the seat of his saddle and with his right to the horse's mane, struggling either to dismount or to keep from falling from his horse—witness could not tell which. He finally got off his horse near the tree 7. The horse trotted off and the man sprang behind the tree. About the time the man reached the tree two shots were fired at

him from the crib (fig. 4). The witness did not see the person who fired those shots, nor did he see anybody at the crib, but he saw the smoke and heard the reports of the gun or guns fired at the crib, and he saw the bark fly off the body of the tree behind which the man was attempting to screen himself. Immediately after the firing of the said two shots Charley Williams ran out of the house (fig. 4), jumped the fence, ran up to the tree, to which the man was clinging with his left arm and hand, and fired the fourth shot. At that shot the man fell in his tracks at the root of the tree. As Charley Williams approached to fire the last shot, the man, still clinging to the tree with his left arm around it, raised his right arm imploringly and exclaimed, "Charley, for God's sake, don't shoot me any more!" Charley replied, "God damn you, I have got you now!" and fired. At no time during the shooting did the man have anything in his hands.

About the time that Charley fired the last shot the witness saw a man with a rope in his hand run out of the crib lot and off up the pasture in a northeast direction, over the course indicated on the diagram by the dotted line 18. After firing the last shot, and after the man fell, Charley Williams ran into his house (fig. 4), and then out and off in the direction taken a few moments before by the man with the rope. Charley then had two guns in his hands. About this time the witness went to the house of a neighbor to get assistance. Returning thence he saw Charley on horseback coming back toward the body over the same route he had recently gone. He stopped for a moment at his house. He then rode to and looked at the man's body, and then to the witness's house. After a few minutes conversation with the witness he rode off, and the witness had never seen him since. When Charley left the witness's house the witness started to the house of Mrs. Ben Williams. En route he met his wife, told her of the killing of the man, and took her back to Mrs. Ben Williams' house. Witness found gun wadding, recently fired from guns, at different points on lines running from the body to Charley Williams' house and from the body to the crib.

Cross-examined, the witness said that while he did not recognize the man who at the last shot fled from the lot (fig. 15) into the pasture with a rope in his hand, he took that man to be Jeff Williams. That opinion was based upon the man's size and height, and the fact that he knew Jeff Williams had been at Charley's house on that day. The man who afterward left the house 4 with two guns was, the witness positively knew, Charley Williams. No weapons of any kind were found on or about the body of deceased.

Jim Bogan testified for the State that he and Jimmy Williams, the son of Mrs. Ben Williams, for whom witness was working, went to the tank (fig. 11) in field 10 to haul some barrels of water. They reached the tank about thirty minutes before sunset. About the time witness reached the

tank he saw the defendant, riding his well know bald-faced sorrel horse, traveling along road 13 from the direction of Mrs. Ben Williams' house toward the house of Charley Williams. A few minutes later he saw that bald-faced sorrel horse standing at the point in the woods marked 19 on the diagram. Soon after that, and while he was filling the barrels with water, Jimmy Williams standing at the heads of the mules hitched to the conveyance containing the barrels, the witness heard four or five gun shots fired at or near Charley Williams' house. A very few minutes later the witness saw the defendant going in a "long trot" from the direction of Charley's house toward his horse at figure 19. Reaching his horse he mounted, rode into field 9 at gate 16, and thence into field 10 at gap 12. When he reached a point near the tank defendant said to Jimmy Williams, who was still at the head of the mules, "Now, Jimmy, for God's sake, whatever else you do, you must never mention my being here this evening." Jimmy replied, "All right, Uncle Luke, I wont." Witness was then under the bank at the tank and could not well be seen by the defendant. Defendant then left, riding fast over the route indicated on the diagram by the dotted line 20, and when last seen by witness was at or near the tree marked 21. On the following day witness, with Giles Averett and others, examined the ground at the place marked 19 on the diagram where defendant's horse was hitched. Tracks showed that the horse stood there for some time. From that point the tracks of the horse were followed through gate 16 into field 9, thence through gap 12 into field 10, and thence across field 10 to a point in the back fence about one hundred yards from a negro cabin (fig. 22). At this point, where a panel of fencing was down, the horse left the field.

The witness did not know, but did not think a man riding along road 8 could see a horse hitched at the point in the woods marked 19. About an hour after the shooting the witness and old man James went to the body of Newman. They examined it closely, without moving it, and found no weapons of any kind on or about it. Thence witness went to Charley Williams' crib, which he found open and full of hogs feeding on the corn stored therein. In that crib he saw a bacon box standing against the wall under some three-inch cracks, which cracks were on a direct line with the tree (fig. 7) at which Newman was shot. Gun wadding was found on the line between that tree and the said cracks. No obstruction whatever intervened between the said tree and the said cracks. The double-barreled muzzle-loading shot gun exhibited in evidence belonged to Charley Williams.

Deputy Sheriff Bickett testified for the State that he reached the Williams place about 3 o'clock on the morning after the killing of Newman. He found the shot gun identified by Bogan on the bed in Charley Williams' house. He also found a six shooter on that bed. Gun wadding was found at different points on lines leading from the house to tree 7 and

from the crib to tree 7. The trunk of the said tree was much blood-stained, bloody finger prints showing that it had been hugged by the deceased after he was shot. Witness had made diligent but ineffectual search for Charley and Jeff Williams. The defendant was arrested at his home on the night after the tragedy.

Giles Averett testified for the State as did Bickett about the appearance of tree 7, and as did Bogan about the bacon box and cracks in the crib and the paper gun wadding found on the line between said cracks and tree 7. On one of those pieces of paper wadding he found some indistinct written characters which he took to be "L. M. Wi-l—am" and "J-e-f-f W." He also testified as did Bogan about following the tracks of the horse from the point in the woods marked 19 through fields 9 and 10; and further that by actual comparison those tracks resembled the tracks of the defendant's bald-faced sorrel horse.

This witness testified further that he arrested the defendant on the night after the homicide at his home near Liberty. He cautioned the defendant that anything he might say about the killing would be used in evidence against him, and notified him that he need make no statement if he did not want to. He then asked defendant when he first heard of the killing. Defendant replied that he first heard of the killing at 12 o'clock on the day after it occurred. The witness then asked him at what hour he got home on the day of the killing. He named several places that he visited on that day, and replied that he got home about sundown. The witness then asked him, "Were you not with Charley on that Monday evening?" Defendant replied, "I guess I had better not answer any more questions."

Deputy Sheriff Will Peel testified for the State that two or three days after the shooting he made a search for the guns Charley Williams was said to have taken away from his house immediately after the shooting. He found two guns hidden under grass and cedar bark at the point in the fence of field 9 marked 25 on the diagram. One of them was a new pistol-grip double-barreled shot gun, both barrels of which had been recently discharged. The other was an old double-barreled shot gun, both barrels loaded with a mixed charge of large buck shot and "blue whistlers." The wadding in one of the barrels of the old gun was an account of Scarborough & Hicks against C. B. Williams.

Al Bussa, testifying for the State, identified the two guns referred to by witness Peel. The new pistol-grip gun belonged to the defendant. Defendant bought that gun soon after the difficulty between his brother Ben Williams, now deceased, and Newman. Ben Williams received wounds in that difficulty from which he subsequently died. The old gun exhibited was the gun of Jeff Blacklock, who lived about a mile from the defendant's house.

Mrs. Blacklock testified for the State that the old gun in evidence was

the property of her husband.    Charley Williams borrowed that gun some-
time before the killing of Newman; returned it on the Friday before the
fatal Monday, and borrowed it again on the next day—Saturday.

Jerry Welhelm was the next witness for the State.    He testified that
he went to the house of Mr. Theus on the night of the tragedy to sit up
with Mrs. Theus, who was sick.    He remained until about 3 o'clock in
the morning.    The defendant came to Theus' house about 8 o'clock on
that night.    Defendant retired about midnight.    An hour or an hour
and a half later he got up, remarking that he could not sleep; that he
dozed off once, but was wakened by George Theus walking across the
room.

Welhelm further testified that on the 2nd day of November, 1888, he
met and had a conversation with defendant.    Defendant, who then had
the pistol-grip shot gun with him, asked witness what he supposed it cost.
Witness named $10 or $12 as the cost.    He replied, "It cost me much
more than that.    If Ben had not got shot it would have cost me nothing.
If Ben had died Tom Newman would have been in hell long ago, and I
would be now in Louisiana or Mexico.    But Ben is about well now, and
as he can settle it himself, I will have nothing more to do with it."    Sub-
sequent to this conversation Ben Williams relapsed, and about two weeks
later died.

Charley Logan testified for the State that some time in February, 1889,
the defendant, talking about the killing of his brother Ben by Newman,
asked him, witness, to go with him, defendant, and help kill Newman.
He urged that request upon the ground that while he, defendant, after
the killing of Newman, would be suspected the witness would not.    Wit-
ness agreed, and defendant said to witness, "Let me know a few days be-
fore you are ready so that I can arrange to prove myself somewhere else
at the time of the killing."    Four or five days afterward defendant came
to witness's house and asked him if he had told anybody about his prop-
osition to witness to kill Newman.    Witness replied that he had not,
although in fact he had told Constable Peel.    Defendant said to witness,
"I was drinking that day or I would not have mentioned it." .

George Theus testified for the State that defendant's wife was at his
house attending his sick wife on the fatal Monday.    She left in the even-
ing, remarking that she could not stay over night as her husband had gone
up the creek to hire a hand to work, and would not be back until next day.
Defendant came to witness's house that night about 8 o'clock and staid
all night.    The witness told him when he came that he knew a good man
to hire.    Defendant replied that he did not want to hire a hand, and did
not go up the creek for that purpose; that he had been to take his mare
to Fisher's stallion, and that the reason his wife had represented his mis-
sion to be to hire a man was that she did not care to mention to the wit-
ness the real character of his trip.    Witness went to town (Milano) on

the next morning, and about noon, on his return, he told defendant's wife, who he found at his house, that he was told in town that Newman was killed on the previous evening.   Mrs. Williams soon left, and within a short time defendant came to witness's house and remarked to him that his wife had told him of the killing of Newman and that he had called to learn the particulars.   Witness told defendant that he did not know the particulars, but was going back to town that evening for information, and asked defendant to go with him.   Defendant replied that he had to hunt a cow and could not go, but would come to witness's house after witness's return.   He came to witness's house after witness got back and asked witness how the killing happened and who was suspected of doing it.   Witness replied that people thought the killing was done by Charley and Jeff Williams.   Defendant, in reply, said that he expected it to be laid on Charley.

Other witnesses for the State located the defendant at different times on the evening of the fatal day at different points on the road traveling from his house toward the Ben Williams place.

Mrs. Newman, the widow of deceased, testified for the State that her husband left home about 3 o'clock to go to the house of Mr. Roberts, on the Rudisil place, to make inquiries about a cow.   The nearest route to the Rudisil place was by the road designated on the diagram by the figures 8, 8, 8.   He did not take his pistol or other arms with him.   The State closed.

Jimmy Williams was the first witness for the defense.   He corroborated Bogan as to what defendant said to him, witness, at the tank a few minutes after the shooting; and as to the movements of defendant immediately before and after the shooting, his testimony did not vary materially from Bogan's.   He stated, however, that he did not see defendant until he got off and left his horse at the point in the woods marked 19 on the diagram.   He next saw the defendant when he returned to and mounted his horse immediately after the shooting.   He did not think the horse was tied at the place marked 19.

West Woods testified for the defense that in a conversation with Newman on January 3, 1889, Newman told him that he had killed Ben Williams, and intended to kill Charley Williams if he lived; that he would aggravate Charley to attack him, and then kill him.   James Warren testified to similar threats by Newman to kill Charley Williams.

Marion Worcester testified for the defense that in January, 1889, he asked Newman how his friends, the Williams boys, were getting along. Newman replied, "Ben, the damned son-of-a-bitch, is dead, and I will get some of the others."   Witness remarked, "You had better let it alone." He replied, "They started it; I will end it."

Dave Barmore testified for the defense that he was the proprietor of a saloon in Milano.   Two or three weeks prior to his death Newman entered

that saloon, where witness, Constable Peel, and Charley Williams then were. He flourished a knife and displayed violent anger. Peel took the knife away from him—having a few minutes before taken a pistol from him. Newman asked Peel if he wanted to see him, Newman, shot in the back like a dog. He then said that a mob was seeking to kill him, Newman, and that he, Newman, would make Peel eat the sights off his pistol before long. Charley Williams had said nothing to nor made any demonstration against Newman.

Mrs. Georgia Williams, the widow of Ben Williams, testified for the defense that on March 20, 1889, Newman stopped at her fence, pointed a pistol at her, and said to her, "God damn you, the Williamses can't live here." Witness screamed, and Newman, pulling his hat down over his face, left rapidly, going down the road. Witness reported that matter to the defendant, who was her double brother-in-law, before Newman was killed.

Miss Milda Williams testified for the defense that on the 20th day of March, 1889—the day referred to by Mrs. Georgia Williams—Newman rode up to the fence surrounding the witness's mother's house (known since her death as Charley Williams' house), presented his pistol at the witness, her sister Belle, and their mother, and said to them, "God damn the Williamses; they shall not live here; if they do I will kill some of them." Witness's sister Belle screamed, when Newman, pulling his hat down over his face, rode rapidly down the road toward the house of Mrs. Ben Williams. Witness's mother never recovered from the fright thus occasioned by Newman, but took to her bed on the next Saturday and died the Friday following. Witness did not tell her brother Charley about this conduct of Newman until the day before Newman was killed.

Miss Belle Williams testified for the defense substantially as did Miss Milda, and in addition, that she saw the defendant when he passed Mrs. Ben Williams' house a few minutes before the killing. He was unarmed, and told witness that he was going down to see Charley Williams, who was Jimmie Williams' guardian, about hiring Jimmie to do some work for him.

Mrs. Fannie Williams, the wife of the defendant, testified in his behalf that he, defendant, left home on the afternoon of the killing to go to Charley Williams' house to see about hiring Jimmie Williams. He took a mare with him to leave at Fisher's. He took no arms with him. Jeff Williams at that time had defendant's gun, having borrowed it on the Saturday before.

*T. S. Henderson* and *Spencer Ford* for appellant.

*W. L. Davidson*, Assistant Attorney-General, for the State.

WILLSON, JUDGE.—A motion to quash the *special venire* made by the defendant was overruled by the court, to which ruling a bill of exception was reserved. A ground of said motion is that after the writ had been issued and placed in the hands of an officer to be executed said officer made alterations therein, to-wit, the name "J. W. Turner" in the list of persons to be summoned was changed to "G. S. Turner," and said writ was served upon G. S. and not upon J. W. Turner. Also that the name "T. U. Pinkerton" in said list was changed to "T. U. Robinson." It was certainly an irregularity for said officer to make said changes, and such conduct deserves condemnation. We think the trial court would have been warranted in quashing the venire upon this ground, and it was error, perhaps, not to do so, but not such error in our opinion as entitles the defendant to a new trial, because it does not appear that he was or could have been injured in his rights by reason thereof. He did not exhaust his peremptory challenges in the formation of the jury. He was tried by a jury of his choice, no objectionable juror having been forced upon him. Code Crim. Proc., art. 777; Bowen v. The State, 3 Texas Ct. App., 617; Allen v. The State, 4 Texas Ct. App., 581; Baker v. The State, 4 Texas Ct. App., 223; Harris v. The State, 6 Texas Ct. App., 97; Taylor v. The State, 14 Texas Ct. App., 340. The other grounds set forth in the motion to quash are, we think, not maintainable, and if they were, would not be material.

It was permissible for the sheriff, under the direction of the court, to amend the return of the *special venire.* Powers v. The State, 23 Texas Ct. App., 42; Rodriguez v. The State, 23 Texas Ct. App., 503. No material error, at least, was committed in allowing the return to be amended in the manner shown in the bill of exception.

Bill of exception No. 3 shows no material error. While the proper practice required that the talesmen should have been drawn from the jurors selected by the jury commissioners to do service during the term, still the defendant was not injured in his rights by a failure to so draw them, because no objectionable juror was forced upon him.

It is objected in this court that the record does not show an order for a *special venire.* This objection was not made in the trial court. It appears from the record that the trial judge's docket shows an entry in the case as follows: "April 29, 1889. Set Tuesday, May 14. Special venire of 100 men returnable Saturday 11." No order for a *special venire* is found in the minutes of the court.

In Steagald v. The State, 22 Texas Court of Appeals, 464, this court said that a conviction in a capital case would not be affirmed where the record failed to show an order of the trial court for the issuance of a *special venire;* that it would not be presumed that such an order was made and entered. Upon a more mature consideration of the question, we are of the opinion that the rule stated in that case is incorrect. We

think the correct rule on appeal is, that where the record is silent as to such order; where no objection was taken *in limine* that such order was not made; where the record shows that a jury was impaneled under a *special venire,* it will be presumed that such order as the law prescribes was made and entered, or that it was waived by the defendant. In this case we are fully warranted in indulging such presumption.

There was no error in rejecting the proposed testimony as to declarations made by the defendant after the homicide. They were not *res gestæ,* and not in explanation of former declarations, but were self-serving in their nature.

We think the charge of the court is full, fair, and correct, and as favorable to the defendant as was demanded by the evidence, and that the special instructions requested were properly refused.

As to the sufficiency of the evidence, while it is circumstantial as to the defendant, it is in our judgment sufficient to establish his guilt as a principal in the murder.

We find no error in the conviction, and it is affirmed.

*Affirmed.*

Hurt, J., absent.